# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

GREGORY REGELBRUGGE, as the
Personal Representative of the Estates
of L. John Regelbrugge III and Molley
(Kris) Regelbrugge; RON SLAUSON,
Individually and as the Personal
Representative of the Estate of Lon E.
Slauson; KRISTINA HARRIS,
Individually and as the Personal
Representative of the Estate of
Stephen Harris and Theresa Harris;
HENRIETTA A. OTTERSEN,
Individually; DAVIS HARGRAVE and
RUTH HARGRAVE, individually and
through their marital community; and
IRVIN WOOD and JUDITH WOOD,
Individually and through their marital
community,

      Appellants/Cross Respondents,

      v.

STATE OF WASHINGTON; GRANDY
LAKE FOREST ASSOCIATES, LLC,
a Washington Limited Liability
Company; and SNOHOMISH COUNTY,

      Respondent/Cross Appellants.

_____

RYAN M. PSZONKA as personal
representative of the ESTATES OF
SHANE RUTHVEN, KATIE RUTHVEN,
HUNTER RUTHVEN, and WYATT
RUTHVEN; AMY S. THOMPSON as
personal representative of the
ESTATES OF LEWIS VANDENBURG
and JUDEE VANDENBERG; SONJA M.
REW as personal representative of the
ESTATE OF GLORIA HALSTEAD;
STEVEN L. HALSTEAD as personal

No. 76376-8-I

DIVISION ONE

PUBLISHED OPINION

Linked with No. 77787-4-I

FILED: December 31, 2018

representative of the ESTATE OF )
JERRY HALSTEAD; and JAMIE A. )
LENNICK as personal representative of )
the ESTATE OF AMANDA LENNICK, )
)
Appellants, )
)
v. )
)
SNOHOMISH COUNTY and )
WASHINGTON STATE DEPARTMENT )
OF NATURAL RESOURCES, )
)
Respondents. )
_____ )
)
TIM WARD, individually and as the )
personal representative of the estate of )
BRANDY WARD; GERALD F. )
FARNES, individually and as the )
personal representative of )
ESTATES OF JULIE FARNES and )
ADAM FARNES; DAYN BRUNNER )
and JASON BRUNNER, as personal )
representatives of the ESTATE OF )
SUMMER RAFFO; DEBORAH L. )
DURNELL, individually and as the )
personal representative of the )
ESTATE OF THOMAS P. DURNELL; )
MARALEE HALL, individually and as )
the personal representative of the )
ESTATE OF JOSEPH R. MILLER; )
SETH JEFFERDS, individually and as )
the personal representative of the )
ESTATE OF CHRISTINA ANNETTE )
JEFFERDS; BRENDA NEAL, )
Individually and as the personal )
Representative of the ESTATE OF )
STEPHEN NEAL; MINDI PEAKE, )
individually and as the personal )
representative of the ESTATE OF )
MARK GUSTAFSON; JONIELLE )
SPILLERS, individually and as the )
ESTATES OF BILLY LEE SPILLERS, )
KAYLEE B. SPILLERS, BROOKE )
SPILLERS, and JOVON MANGUAL; )

JONIELLE SPILLERS as guardian of ) 
JACOB SPILLERS; and ABBIE ) 
PEARSON, individually and as the ) 
personal representative of the ESTATE ) 
OF MICHAEL PEARSON, ) 
) 
            Plaintiffs, ) 
) 
      v. ) 
) 
SNOHOMISH COUNTY; STATE OF ) 
WASHINGTON; and the GRANDY ) 
LAKE FOREST ASSOCIATES, LLC, a ) 
Washington Limited Liability Company, ) 
) 
         Defendants. ) 
                 )
                 ) 
RANDI LESTER, individually, and as ) 
Personal Representative for the ) 
Estate of DENVER HARRIS; ROBIN ) 
YOUNGBLOOD, individually; and ) 
MARK LAMBERT, ) 
) 
         Appellants, ) 
) 
      v. ) 
) 
SNOHOMISH COUNTY; STATE OF ) 
WASHINGTON, DEPARTMENT OF ) 
NATURAL RESOURCES; and GRANDY) 
LAKE FOREST ASSOCIATES, LLC, a ) 
Washington Limited Liability Company, ) 
                 ). 
         Respondents. )

BECKER, J. — These linked appeals were brought by survivors of the 2014 Oso Landslide and representatives of those who died. They challenge summary judgment orders by which the trial court dismissed their tort claims against Snohomish County. We conclude that the trial court reached the correct result. It is beyond question that appellants suffered terrible losses, but their theories

3

and evidence do not establish a basis for holding the County liable for those losses. Accordingly, we affirm.

## FACTS

The site of the Oso Landslide is a hill alongside the North Fork of the Stillaguamish River. Landslides have occurred there for decades. In 1967, a major slide destroyed cabins in the area and pushed the river channel southward 700 feet. The river gradually moved back to the base of the hill in later years.

The area was the subject of considerable research. In a 1999 report, geologist Daniel Miller explained that the interaction between the river and the "landslide toe" caused erosion and instability. Miller said he "had no basis for estimating the probable rate or timing of future landslide activity." He said, "The primary conclusion to be drawn is that mass wasting activity will persist for as long as the river remains at the toe of the landslide." Miller's report discussed protection of the toe as a means of slope stabilization, but noted concern about the potential for another landslide that would overrun the diversion structure, as occurred in the 1967 event. He described a model that estimated "the volume that could be mobilized in a large, catastrophic slump" as producing a debris runout of 880 feet, comparable to the area affected in 1967. Miller explained that this analysis did "not account for progressive failure that may occur as landsliding alters slope geometry." The report included an illustration showing even larger volumes that "could be mobilized by further destabilization," although Miller explained that such "results are largely speculative." In this illustration, according

4

to Miller's report, the estimated volumes "increase by an order of magnitude."

Miller's report ultimately recommended diverting the river away from the toe:

> Diversion of the mainstem will act both to stabilize the landslide (by protecting the toe) and add storage area for sediment shed from the landslide, which will reduce delivery of sediment to the river. The simple analysis presented above suggests that the diversion should be located to direct the channel course at least 900 feet, at its farthest extent, from the current base of the landslide to accommodate runout of landslide debris.

The Stillaguamish Tribe of Indians, in collaboration with the United States Army Corps of Engineers, commissioned additional reports on the landslide. In a report completed in 2000, engineer Tracy Drury proposed building a "series of revetments" that "would eliminate toe cutting of the slide and create setting ponds for fine materials delivered to the mainstem from the multiple streams that drain the slide area." In another report, completed in 2001, Drury cited Miller's estimation that the current runout potential of the slide was around 900 feet. The 2001 report explained that slides harmed the river ecosystem and posed "a significant risk to human lives and private property." The neighborhood of Steelhead Haven, home to many full-time residents, lay directly across the river. The report identified various options for mitigating the slide risks. The recommended option was construction of "wood revetments" on state-owned land between the river and the base of the hill. According to the report, this structure would reduce erosion of the landslide toe and capture sediment that would otherwise travel downstream and destroy fish habitat. The Tribe decided to undertake a project to carry out Drury's recommendation. The parties call this project the "revetment" or "cribwall."

In February 2004, the County enacted an ordinance adopting a "Comprehensive Flood Hazard Management Plan" concerning the Stillaguamish River. Counties are granted authority to enact flood hazard management plans by RCW 86.12.200. The County's plan stated "recommended actions." These included, "Implement Steelhead Haven Landslide stabilization project to meet public safety goals." The plan explained that there were proposals under development by tribal, state, and federal agencies, with estimated costs "between 1 million to 10 million depending on which alternative is selected." Another section recommended that the County should implement a stabilization project through the authority of the Corps "that meets public safety and environmental restoration goals of this plan." The plan stated, "As part of this project, the landslide and flood risk to residents can also be reduced or eliminated."

The County and the Tribe were co-coordinators of the "Stillaguamish River Salmon Recovery Lead Entity," and they had been for several years at the time the cribwall project was conceptualized. A state publication describes lead entities as "community-based groups that develop salmon habitat restoration strategies and recruit organizations to implement projects." Lead entities are required by statute to "establish a committee that consists of representative interests of counties, cities, conservation districts, tribes, environmental groups, business interests, landowners, citizens, volunteer groups, regional fish enhancement groups, and other habitat interests." RCW 77.85.050(1)(b). "The

purpose of the committee is to provide a citizen-based evaluation of the projects proposed to promote salmon habitat." RCW 77.85.050(1)(b).

Consistent with these requirements, the Stillaguamish River Salmon Recovery Lead Entity included the Stillaguamish Implementation Review Committee, established in 1990. Each year, the Committee created a list of prioritized projects to submit to the Salmon Recovery Funding Board, a body that administers state and federal funds for salmon recovery efforts. The Committee included the cribwall project on the list sent to the Board in 2004. The Board agreed to grant funding for the project. The Tribe obtained additional funding through other sources.

In January 2006, before construction of the cribwall began, another large slide occurred at the site. The runout was approximately 700 feet. Debris blocked the river channel. The Snohomish County Department of Emergency Management worked to protect Steelhead Haven from flooding. This work involved creating a new river channel to the south of the old channel. County workers also placed sand bags near residences.

The Snohomish County Department of Public Works decided to hold a community meeting in March 2006, one month after the slide, to apprise Steelhead Haven residents of future flood and landslide risks. One claim asserted by the plaintiffs is that the information provided at this meeting did not alert them to the extent of the landslide danger, and instead it lulled them into a false sense of security.

7

The cribwall was constructed later in 2006 after the Tribe obtained permitting required by the State Department of Fish and Wildlife.

The catastrophic Oso Landslide occurred eight years later, on March 22, 2014. It was a clear day during a period of heavy rainfall. The slide was unprecedented in its size and mobility. Debris quickly traveled 3,000 feet, burying Steelhead Haven and a nearby highway, SR 530. The slide killed 43 people, injured others, and destroyed the property in its path. It was among the most destructive landslides in United States history.

Lawsuits followed. Survivors of the slide and personal representatives of the estates of decedents sued Snohomish County, the State of Washington, and a timber company that owned property above the landslide area. Four suits, each involving numerous plaintiffs, were consolidated for trial. The plaintiffs remained in four groups—"Regelbrugge," "Pszonka," "Ward," and "Lester"—each with separate counsel. The gravamen of their complaints was that the defendants contributed to and could have prevented the devastation of the slide. They alleged that the timber company increased the slide risk by harvesting trees in the landslide area. They asserted the State was negligent for granting permits to the timber company and for allowing construction of the cribwall, which, plaintiffs alleged, was faulty and not an appropriate remediation measure. Other claims included that the State negligently investigated conditions after the 2006 slide and failed to warn community members about future slide risks. Against the County, the plaintiffs asserted negligence and strict liability claims based

8

primarily on the 2004 flood plan, the 2006 community meeting, and the construction of the cribwall.

In a series of summary judgment orders issued in 2015 and 2016, the trial court dismissed virtually all claims of County liability. The court facilitated immediate appeal by entering judgments under CR 54(b) on September 14 and September 23, 2016.

The Pszonka, Ward, and Lester groups (hereinafter "Pszonka") challenged orders dismissing claims against the County in a motion for review filed in the Supreme Court. Meanwhile, the plaintiffs' claims against the State and the timber company were resolved by settlements. The Supreme Court transferred the Pszonka appeal to this court. We linked it with an appeal filed in this court by the Regelbrugge group. We address both appeals in this opinion.

Issues resolved on summary judgment are reviewed de novo. Osborn v. Mason County, 157 Wn.2d 18, 22, 134 P.3d 197 (2006). We consider the evidence in the light most favorable to the party who opposed summary judgment. We will affirm only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). The aim is to avoid a useless trial. Preston v. Duncan, 55 Wn.2d 678, 681, 349 P.2d 605 (1960). Trial is not useless but absolutely necessary when there are issues for a jury to resolve. Preston, 55 Wn.2d at 681.

> "Summary judgment procedure is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial, it is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right of trial by jury if *they*

9

*really have evidence which they will offer on a trial*, it is to carefully test this out, in advance of trial *by inquiring and determining whether such evidence exists."*

Preston, 55 Wn.2d at 683, quoting Whitaker v. Coleman, 115 F.2d 305, 307 (5th Cir. 1940). Applying this standard, we conclude Snohomish County is entitled to judgment as a matter of law.

## ANALYSIS

### 1. The County's adoption of the flood control plan is immunized.

Pszonka challenges the trial court's dismissal of claims that were based on the "Flood Hazard Management Plan" adopted by the County in 2004. The plan identified the cribwall project as a means of achieving certain environmental and safety objectives. Pszonka contends that the County undertook a "legislative duty to warn" and that "the County's duty to protect Steelhead Haven through construction of a cribwall, necessarily included the duty to warn the community of the danger it faced until such protective construction occurred."

The trial court determined that claims based on the flood plan were barred by former RCW 86.12.037 (2004). The statute precludes suits against counties for acts or omissions "relating to the improvement, protection, regulation and control for flood prevention":

> No action shall be brought or maintained against any county alone or when acting jointly with any other county under any law, its or their agents, officers or employees, for any noncontractual acts or omissions of such county or counties, its or their agents, officers or employees, relating to the improvement, protection, regulation and control for flood prevention and navigation purposes of any river or its tributaries and the beds, banks, and waters thereof: PROVIDED, That nothing contained in this section shall apply to or

affect any action now pending or begun prior to the passage of this section.[1]

This statute was enacted "to shield counties from liability for their efforts to protect the public from flood damage." Paulson v. Pierce County, 99 Wn.2d 645, 649, 664 P.2d 1202 (1983), citing Short v. Pierce County, 94 Wash. 421, 430-31, 78 P.2d 610 (1938).

The 2004 flood plan is rightly and fairly characterized as a flood control effort covered by the statute. The title was "Comprehensive Flood Hazard Management Plan." It was enacted under the authority of chapter 86.12 RCW—Flood Control by Counties. The ordinance adopting the plan states, "floods on the Stillaguamish River floodplain have historically presented serious threats to public health and safety and have caused millions of dollars worth of damage to public and private properties." It also states "the Snohomish County Department of Public Works has developed a Stillaguamish River Comprehensive Flood Hazard Management Plan, the purposes of which are to reduce the threat to public health and safety, minimize property damage from floods, and reduce costs of flood protection to the greatest extent feasible." The plan established various "goals" for addressing "flood hazards."

Pszonka contends that a project is not entitled to immunity "unless the actions are specifically and exclusively related to flood control." Pszonka asserts that the version of the cribwall project in the 2004 Flood Plan had nothing to do

---

[1] We quote the version of the statute in effect in 2004, when the County adopted the flood plan. It has since been amended.

with flooding. In Pszonka's view, the project pertained solely to landslide prevention and protection of fish habitat.

The immunity statute requires that an act relate to flood control. It does not require that flood control be the exclusive purpose. It is appropriate to describe the County's adoption of the cribwall project in the flood plan as an act "relating to" flood control. The plan specifically stated that the "slide stabilization project" (i.e., the cribwall) would reduce or eliminate the "flood risk to residents." Slide and flood risks are closely related. The plan explained, for instance, that slides could "block the current flow of the river forcing the river into a new pathway, which would again threaten life and property on the south bank." This is exactly what happened in 2006—a landslide caused a flood emergency in Steelhead Haven.

Pszonka argues that immunity under the statute applies "only to the construction and maintenance of flood control devices that cause damage to private property during installation or later flood events." Pszonka contends that because the plaintiffs in this case suffered losses resulting from a landslide, not a flood, the immunity statute does not apply. We disagree. The immunity statute does not contain such a limitation.

We conclude that the County's adoption of the flood plan and its selection of the cribwall as a recommended action are acts immunized by former RCW 86.12.037 (2004). The claims arising from these acts were properly dismissed.

## 2. The County's actions related to constructing the cribwall are immunized.

Appellants maintain that a jury should decide whether the County is liable for its involvement in the construction of the cribwall. They contend that the cribwall project was not properly evaluated, that it was not an appropriate landslide remediation measure, and that it contributed to the devastation of the slide.

The County defends against these claims by arguing that its involvement in the cribwall project was minimal and in addition that its actions are immunized under RCW 36.70.982 because the cribwall was a "fish enhancement project."

Whether the County's involvement in building the cribwall was sufficient to give rise to liability may be a factual issue. A government entity "undertakes to act," and thereby has a duty to follow through with reasonable care, when the entity "actively participates in designing and funding" a project. Borden v. City of Olympia, 113 Wn. App. 359, 369-70, 53 P.3d 1020 (2002), review denied, 149 Wn.2d 1021, 72 P.3d 761 (2003), citing Phillips v. King County, 136 Wn.2d 946, 967-68, 968 P.2d 871 (1998). There is evidence that the Stillaguamish Implementation Review Committee—a group co-led by the County—helped the Tribe obtain funding for the cribwall and evaluated designs for the project, and that County employees were involved in the construction process.

But even if the County was sufficiently involved, it is immune from suit for that involvement. A county is "not liable for adverse impacts resulting from a fish enhancement project that meets the criteria of RCW 77.55.181 and has been permitted by the department of fish and wildlife." RCW 36.70.982. The cribwall

13

is a fish enhancement project. And it is undisputed that the Tribe received permitting for the cribwall under the streamlined process available through RCW 77.55.181.[2]

Appellants claim the project did not meet the criteria set forth in RCW 77.55.181(1)(b). That section requires the state to develop "size or scale threshold tests" to determine if projects should be evaluated under the process created by the statute. "A project proposal shall not be reviewed under the process created in this section if the department determines that the scale of the project raises concerns regarding public health and safety." RCW 77.55.181(1)(b). When the permit for the cribwall was issued in 2006, the department had not yet adopted the size and scale threshold tests required by the statute. Regelbrugge contends that the large cribwall—measuring 1,500 feet long, 30 feet in width, and 15 feet high—was therefore not properly evaluated with regard to size and safety. Pszonka argues, relatedly, that the permitting process available through chapter 77.55 RCW was inappropriate for large-scale projects.

These arguments do not show noncompliance with RCW 77.55.181(1)(b). Even if no size or scale tests were in place at the time the Tribe applied for a permit, the department reviewed the cribwall as a fish habitat enhancement project and approved it. The approval of the permit indicates that, in the

---

[2] Formerly RCW 77.55.290 (2004), recodified as RCW 77.55.181, LAWS OF 2005, ch. 146, § 1001.

department's view, the scale of the cribwall project did not make it potentially threatening to public health or safety.

Another criterion for eligibility for the streamline permit process is that a project must be designed to accomplish one or more of the tasks enumerated in the statute:

> (i) Elimination of human-made or caused fish passage barriers . . .;
> (ii) Restoration of an eroded or unstable stream bank employing the principle of bioengineering, including limited use of rock as a stabilization only at the toe of the bank, and with primary emphasis on using native vegetation to control the erosive forces of flowing water; or
> (iii) Placement of woody debris or other instream structures that benefit naturally reproducing fish stocks.

RCW 77.55.181(1)(a). The Tribe's permit application stated that the cribwall project was aimed at restoring "an eroded or unstable stream bank using bioengineering techniques" and placing "woody debris or other in-stream structures that benefit naturally reproducing fish stocks." Regelbrugge contends that the project was nonetheless ineligible for permitting because another purpose of the cribwall was landslide remediation. But the statute does not foreclose eligibility for a project that accomplishes one of the identified tasks, such as fish habitat restoration, and also serves some other purpose, such as landslide prevention.

Appellants also contend that the legislature, in crafting RCW 36.70.982, intended to protect counties only against claims arising from their inability to issue permits for fish habitat enhancement projects. RCW 77.55.181(4) removes their discretion to do so, reserving this authority to the state. This argument tries to read into the statute an intention not found there. The statute simply gives

15

immunity for "adverse impacts resulting from a fish enhancement project." RCW 36.70.982. Because the statute's meaning is clear based on its text, our inquiry is at an end. O.S.T. v. Regence BlueShield, 181 Wn.2d 691, 696, 335 P.3d 416 (2014). We conclude that the immunity provided by RCW 36.70.982 applies to plaintiffs' claims that are based on construction of the cribwall.

### 3. The strict liability claims are untenable.

Regelbrugge asks for reinstatement of two strict liability claims brought against the County in its role as a proponent of the cribwall project and as a landowner, "because it violated riparian rights and created hazardous conditions." These claims are based on Regelbrugge's assertion that during construction of the cribwall, the Tribe removed trees from property owned by the County along the river. According to Regelbrugge, the clear-cutting on the property caused a change in the river's course that contributed to the landslide.

The County disputes that it owned the property, an issue we need not resolve. Even assuming the County is the owner, Regelbrugge's strict liability claims are untenable.

Regelbrugge invokes riparian law. "Riparian rights, where they exist, derive from the ownership of land contiguous to or traversed by a watercourse." Dep't of Ecology v. Abbott, 103 Wn.2d 686, 689, 694 P.2d 1071 (1985). These rights of the owner include the right to have water flow past the owner's property in its natural condition. Richert v. Tacoma Power Utility, 179 Wn. App. 694, 703, 319 P.3d 882, review denied, 181 Wn.2d 1021, 337 P.3d 882 (2014)). See also Judson v. Tide Water Lumber Co., 51 Wash. 164, 169, 98 P. 377 (1908) (riparian

16

proprietors on a river "have the right to prevent the obstruction of the flow or the diversion of its waters, and to have the same continue to flow in a natural way by their lands. This is a right inseparably annexed to the soil itself"). "A riparian owner may not divert water in a natural watercourse without facing liability for damages caused to other riparian owners." Richert, 179 Wn. App. at 703, citing Fitzpatrick v. Okanogan County, 169 Wn.2d 598, 608, 238 P.3d 1129 (2010).

Regelbrugge contends that because the County allowed the Tribe to remove trees on its land, the County is liable for diverting the river and thereby contributing to the plaintiffs' damages. This theory does not depend on the plaintiffs having riparian rights. Rather, Regelbrugge contends that riparian law creates a right to recover personal injury damages caused by diversion of a river regardless of whether the plaintiffs are riparian landowners. We decline to extend riparian law in this manner. The law is clear that riparian rights derive from property ownership. Abbott, 103 Wn.2d 686. Regelbrugge asserts, in a footnote, that four plaintiffs "had property immediately adjacent to the river." But Regelbrugge does not point to evidence sufficient to prove that these plaintiffs were riparian owners, nor does Regelbrugge argue that their ownership status is the reason they are entitled to relief.

Regelbrugge also contends the County is liable because the clear-cutting created a hazardous condition about which the County knew or should have known. Regelbrugge cites Albin v. National Bank of Commerce, 60 Wn.2d 745, 375 P.2d 487 (1962) and Price v. City of Seattle, 106 Wn. App. 647, 24 P.3d 1098, review denied, 145 Wn.2d 1011, 37 P.3d 291 (2001). Those cases show

that a landowner may be liable for damage caused by a dangerous condition on the land when the owner knew or should have known about the hazard. Albin, 60 Wn.2d at 752; Price, 106 Wn. App. at 656. Regelbrugge argues that the County had "actual knowledge of the cribwall" and that the record contains "ample evidence of what the County did to increase the risk of the Oso Landslide." Regelbrugge has not shown, however, that the County had actual or constructive knowledge that the Tribe's removal of the trees created a hazardous condition.

In any event, there is another reason to dismiss claims based on the clear-cutting: they are barred by RCW 36.70.982, the statute conferring immunity for adverse effects of fish enhancement projects. There is no dispute that the Tribe removed the trees in connection with construction of the cribwall. The Tribe's permit application explains that trees "currently located between the river and the landslide will be cleared and stockpiled for use in the cribwall structures." Because the cribwall was a fish enhancement project, the immunity statute precludes claims against the County based on the removal of trees used for the cribwall.

In sum, the strict liability theories asserted by Regelbrugge do not provide a basis on which reasonable jurors could render a verdict in their favor.

4. The rescue doctrine does not provide a basis for County liability.

The rescue doctrine is an exception to the traditional rule that there is no duty to come to a stranger's aid. Folsom, 135 Wn.2d at 674. "One who undertakes, albeit gratuitously, to render aid or to warn a person in danger is

18

required by our law to exercise reasonable care in his efforts, however, commendable." Brown v. MacPherson's, Inc., 86 Wn.2d 293, 299, 545 P.2d 13 (1975). "If a rescuer fails to exercise such care and consequently increases the risk of harm to those he is trying to assist, he is liable for any physical damages he causes." Brown, 86 Wn.2d at 299.

Appellants contend that at the community meeting held by the County in March 2006, the County undertook a duty to warn residents that they were in danger of future landslides. They argue that the County's warning negligently downplayed the risk. They say that if the County had informed the attendees of the full extent of the danger, a jury could find that the attendees would have shared that information with other residents and the community as a whole would have "demanded action by the County." They contend the County's communications lulled those who attended the meeting into believing they were safe and that there was no need to "galvanize the Steelhead Haven community into action." They say that everyone in the community "would have assessed their risk if they had accurate information from the County."

Without deciding the issue, we will assume that by holding the meeting, the County undertook to warn the Steelhead Haven community about the danger of future landslides and consequently had a duty to use reasonable care in doing so. We conclude the appellants have not demonstrated that the County failed to act with reasonable care in a way that caused their damages.

The record does not support the allegation that the County lulled residents into believing they were safe and that there was no need to take action.

19

According to the meeting notice, the very purpose of the event was to "inform the community about current and future risks at the site" and to stir the community to "assess the on-going risks and to make appropriate choices on how to deal with those risks":

> Dear Landowner,
>
> Snohomish County will hold a community meeting on March 11th, 2006 at 10:00 AM at the Oso Fire Station to discuss some of the short term and long term risks to the area associated with the recent slide and to facilitate the community planning to address these issues.
>
> The intent of this meeting is to inform the community about current and future risks at the site, such as additional land slides, flooding and erosion.
>
> This was an extraordinary event and many agencies came together in a very short amount of time to clear a path for the river once it was blocked. It is now time for the community to assess the on-going risks and to make appropriate choices on how to deal with those risks.
>
> Thank you in advance and I hope to see you at the meeting.

The notice was signed by the County's Director of Public Works.

The meeting occurred as planned on March 11, 2006. According to the meeting outline, one topic was "Landslide - geology and future risks." The speaker on this topic was County geologist Jeffrey Jones. According to Jones's deposition testimony, he gave a presentation on the slide's history and geology and showed a geologic map of the area. Jones testified that his intent was to help residents make "decisions on their own, help to evaluate the risks." He recalled telling attendees that the landslide "was unpredictable and activity on the

20

slide could be expected in the future. As it had demonstrated in the past, it was active intermittently and that activity was likely to continue."

An individual who attended the meeting recalled hearing from Jones "that it was a landslide prone area and that landslides could be expected in the future." This person said, "I cannot recall any speaker at the meeting making assurances that there would not be any further flooding or landslide risks in the Steelhead Haven neighborhood." Another individual who attended the meeting recalled hearing "that the community could not expect the County and Army Corps of Engineers to come to the rescue in the future. They recommended that we get organized and form something like a flood control district or homeowner's association."

In response to the County's motion for summary judgment, the plaintiffs introduced testimony from other individuals who attended the 2006 meeting. They said that the cribwall project, which was discussed at the meeting, made them feel safer and that they believed the cribwall would prevent landslide activity. One of them testified, "The meeting didn't affect me much in any way except I know some people later talked about getting flood insurance. I don't -- I don't recall anything but discussion about flooding, possible flooding." Another testified that she walked away from the meeting believing that the County "had everything under control." Another attendee similarly stated, "I took away from the presentations that the County had a game plan for dealing with the risk of another slide/flood. . . . I left the meeting with the understanding that the County wanted us to know that they had looked at the reasons for the slide and flood and

that . . . the plan they outlined would prevent that situation from ever being an issue again." The attendee said, "I felt safe living in Steelhead Haven after the March 11, 2006, meeting. . . . They were building the cribwall so the river would not erode the toe of the hillside. I believed my family was safe." This evidence shows what attendees felt and believed, but it is not evidence of what the County representatives actually said. No one recalled hearing County representatives say that the risk of danger from future slides was minimal or that the cribwall was a guarantee against a catastrophic event.

Appellants contend the discussion of future risks was negligent because the County's speakers did not specifically discuss the catastrophic possibility identified in the 1999 Miller report—that a future landslide could be an order of magnitude larger than the previous one, as catastrophic and life-threatening as the Oso slide that actually occurred on March 22, 2014. Jones had read the 1999 report in which Miller mentioned the possibility of the large volumes of debris that "could be mobilized by further destabilization." According to Jones's deposition testimony, he did not talk about this portion of Miller's report at the meeting because "in Miller's paper, he described what he was able to state as being largely speculative, quote/unquote."

Jones recommended Miller's report to meeting attendees as an additional resource and offered to make copies for anyone who followed up with him. No one did. Given the voluminous amount of technical information the County was attempting to summarize and communicate to the meeting attendees in a limited amount of time, the exercise of reasonable care did not require the County to

predict a scenario that Miller regarded as speculative. Miller himself testified in deposition that he did not anticipate a slide the size of the 2014 event and that he was surprised by what occurred. He testified that nothing in his 1999 report warned of the risk of a landslide "with a runoff that would go into the Steelhead Haven neighborhood to the extent that the 2014 slide did."

And even if a jury were to find that the County in the exercise of reasonable care should have highlighted the worst case scenario imaginable, the question still remains whether the County's presentation induced reliance by anyone who heard it or heard about it. "A person who voluntarily promises to perform a service for another in need has a duty to exercise reasonable care when the promise induces reliance and causes the promisee to refrain from seeking help elsewhere." Folsom, 135 Wn.2d at 676 (emphasis added). "Even where an offer to seek or render aid is implicit and unspoken, a duty to make good on the promise has been found by most courts if it is reasonably relied upon." Brown, 86 Wn.2d at 301 (emphasis added).

Brown, the case on which the appellants primarily rely, is a close precedent factually because it involved application of the rescue doctrine to claims of loss of life and property arising from an avalanche. The avalanche occurred in January 1971 in a developed area of Stevens Pass known as Yodelin. The State of Washington was among the defendants. Plaintiffs alleged that avalanche expert Dr. Edward LaChapelle warned a Mr. Tonnon, an agent of the Real Estate Division of the Department of Licensing, that the Yodelin development was in an area of high risk for avalanches. Tonnon allegedly

"responded in a manner which led Dr. LaChapelle justifiably to believe that the division would deal with the matter and convey his warning to appellants." Brown, 86 Wn.2d at 298. The State did not pass on the warning. Tonnon met with William MacPherson, a real estate broker associated with the development, and led him "to erroneously believe that . . . no avalanche danger existed." Brown, 86 Wn.2d at 298. The plaintiffs claimed that Tonnon's omissions deprived them of the opportunity to be forewarned of their danger by either Dr. LaChappelle or MacPherson, and they were thus "unable to avoid the losses they suffered when the avalanche that had been predicted actually occurred." Brown, 86 Wn.2d at 298-99. At the trial court level, the State's motion to dismiss under CR 12(b)(6) was granted, but the Supreme Court reversed and allowed the claim against the State to go forward. The court concluded that the facts alleged in the complaint stated a claim of negligence by malfeasance and nonfeasance, both arising from the rescue doctrine. Brown, 86 Wn.2d at 299-300.

In Brown, the court characterized the rescue doctrine as arising from "promises which induce reliance, causing the promisee to refrain from seeking help elsewhere and thereby worsening his or her situation." Brown, 86 Wn.2d at 300. The court later referred to "reliance" as "the linchpin of the rescue doctrine." Osborn, 157 Wn.2d at 25. In Brown, the State's duty to act arose from "reliance by another"—by Dr. LaChappelle, who refrained from warning the plaintiffs as a result of Tonnon's promise that he would communicate the warning, and by MacPherson, who refrained from warning the plaintiffs because Tonnon told him no avalanche danger existed.

24

Here, appellants claim the County's duty to act arose because the County's negligent warning induced them to feel secure. They say that as a result of the County's presentation, those at the meeting refrained not only from acting to protect themselves but also from acting to warn other community members who were not in attendance.

Appellants have not shown that anything said at the meeting could reasonably be interpreted as a promise that the cribwall would confine the debris runout from future slides so that residents would be safe in their homes. The County did not deprive the attendees of the opportunity to be informed about the risks of landslides and in fact encouraged them to seek out more information. The County's warnings of the danger of future slides did not make the situation of the Steelhead Haven residents worse than if the County had not held a meeting.

Reliance is not established by asserting that residents would have escaped the path of the landslide if the County had depicted the risk in the most extreme terms possible. The County argues, "If liability could so easily be imposed for things unsaid at public safety meetings, governmental entities would cease holding meetings about natural and manmade disasters altogether, leaving communities worse off." We agree and conclude that the appellants are not entitled to relief under the rescue doctrine.

### 5. The County had no duty under the affirmative undertaking doctrine.

Pszonka invokes the affirmative act doctrine as another basis for penalizing the County's alleged failure to provide an adequate warning. Under that doctrine, an act or omission "may be negligent if the actor realizes or should

25

realize that it involves an unreasonable risk of harm to another person through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." RESTATEMENT (SECOND) OF TORTS § 302B (AM. LAW INST. 1965). For example, a bus driver's act of getting off the bus while keys were in the ignition and a visibly erratic passenger was onboard created liability to plaintiffs who were injured when the passenger took control of the bus and drove it into their car. Parrilla v. King County, 138 Wn. App. 427, 430, 157 P.3d 879 (2007).

In this case, there has been no showing that the County's act of distributing information at the community meeting exposed the residents to the risk of the coming landslide. The trial court correctly determined that the affirmative act doctrine does not apply.

Regelbrugge contends that the trial court erred by refusing to strike an "act of God" defense asserted by the County. Our conclusion that the appellants cannot proceed to trial against the County makes it unnecessary to address this issue.

Affirmed.

Becker, J.

WE CONCUR:

Andrus, J.